(No. 7108. June 22, 1943.)

CHARLES T. HAWKINS, Plaintiff, v. CHARLES E. WIN-STEAD, one of the Judges of the District Court of the Third Judicial District of the State of Idaho, in and for the County of Ada, Defendant.

[138 Pac. (2d) 972.]

Harry Keyser for plaintiff.

Bert H. Miller, attorney general of Idaho, and J. F. Martin for defendant.

HOLDEN, C.J.—This is an application for a writ of mandate to require and direct Hon. Charles E. Winstead, one of the judges of the District Court of the Third Judicial District of the state of Idaho in and for Ada county, to take jurisdiction of the divorce suit of *Hawkins v. Hawkins*, commenced in said district court by the applicant herein against his wife, Laura Hawkins, August 24, 1942. An alternative writ issued to which the defendant answered denying jurisdiction on the ground applicant was not a resident of the State of Idaho at the time he filed his complaint.

The facts appear to be substantially as follows: That May 22, 1941, applicant, while a private in the United States Army, stationed at Langley Field, Virginia, married; that immediately thereafter he was transferred to Westover Field, Massachusetts, and in January, 1942, was again transferred and assigned to the air base at Gowen Field, near Boise, in Ada County, Idaho; that shortly after being transferred to Gowen Field applicant was granted permission by his commanding officer to live in Boise, pursuant to which he rented a room in Boise, made his home and lived there and off the Gowen Field Base, reporting for duty at Gowen Field as required; that applicant decided to make Boise his future home to return to whenever he should be discharged from and his services no longer required in the Army; that with that bona fide purpose and intent, applicant registered in the City of Boise as a voter and elector; that following the filing of the complaint in divorce, as aforesaid, summons issued; that pursuant to an appropriate order therefor, summons was served by publication and that defendant Laura Hawkins was, and is, in default; that in the divorce suit applicant submitted proof in support of his complaint and rested, whereupon defendant judge being in doubt as to whether a person serving in the armed forces of the United States (as was and is the applicant herein) could establish a new residence while so serving his country, reserved the matter of passing on that question; that thereafter, to-wit, October 23, 1942, the defendant judge entered an order in effect holding that a person could not, while serving in the armed forces, establish a new residence, and, therefore, that the court was without jurisdiction, and on that ground denied the divorce.

Sec. 5 of art. VI, of the constitution of the State of Idaho provides:

"[Sec. 5.] Residence for voting purposes not lost or gained.—For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of this state, or of the United States, nor while engaged in the navigation of the waters of this state or of the United States, nor while a student of any institution of learning, nor while kept at any alms house or other asylum at the public expense." [Immediately following statehood the legislature adopted this section, without any change, now sec. 33-403, I.C.A.]

Sec. 31-701, I.C.A., as amended by chap. 94, S.L. 1937, p. 132, provides:

"Section 1. That Sec. 31-701, Idaho Code Annotated, be and the same is hereby amended to read as follows:

"31-701. Residence Required by Plaintiff.—A divorce must not be granted unless the plaintiff has been a resident of the state for * * six full weeks next preceding the commencement of the action."

If service in the armed forces of the United States is not in and of itself, under sec. 5, supra, a bar to establishing a new residence, then and in such case, under sec. 31-701, supra, residence in this state "for six full weeks next preceding the commencement of the (divorce) action" is sufficient. Therefore, we address ourselves to the consideration of sec. 5, supra.

First: It will have been noted that sec. 5, supra, goes solely and only to the matter of gaining or losing residence for *voting* purposes, not to the matter of establishing a new residence for the purpose of prosecuting a suit for divorce. Secondly: Can the courts, absent both constitutional and statutory law (sec. 33-403, I.C.A., being identically like sec. 5, supra), concerning the matter of establishing a new residence for the purpose of prosecuting a suit for divorce, *enact* that service in the United States Army shall constitute a bar to the establishment of such new residence? Of course not. There being, then, neither a constitutional nor statutory bar to establishing a new residence while serving in the armed forces of the United States, it follows that applicant could establish a new residence in the State of Idaho while serving in the United States Army. In support of this view, we direct attention

to the very recent case of *Gipson v. Gipson* (Supreme Court of Florida, en banc) 10 So. (2d) 82, where that court held:

"To effect a change of domicile there must be a removal and an intent. That the former is accomplished because of the performance of duty (as is true of the applicant herein) by one in the service of his country is immaterial where, as in the instant case, the latter is established. In such circumstances the rule that there must be concurrence of factum and animus is satisfied."

And in *Kankelborg v. Kankelborg* (Supreme Court of Washington) 90 P. (2d) 1018, 1019, that court held:

"The domicile of a soldier or sailor in the military or naval service of his country generally remains unchanged, domicile being neither gained nor lost by being temporarily stationed in the line of duty at a particular place, even for a period of years. A new domicile may, however, be acquired if both the fact and the intent concur.

"An officer or a private may acquire a domicile outside his military or naval station, the fact of change being established by independent evidence."

To the same effect 19 C.J. 418; 28 C.J.S., sec. 12, p. 28; Ex Parte White, 228 F. 88; *Wood v. Fitzgerald*, 3 Ore. 568, *Johnston v. Benton*, (Cal. App.) 239 P. 60.

But it is insisted that under the rule announced by this court in *Powell v. Spackman*, 7 Ida. 692, 65 P. 503, applicant could not establish a new residence while serving in the United States Army and thus give the court jurisdiction of his divorce suit. The question presented in that case was:

"Can this residence (referring to voting residence) be acquired by a person who is an inmate of an almshouse or of an asylum kept at public expense, while residing in such almshouse or asylum? * * *

"It will be seen that the specific inquiry here is whether a resident of some county other than Ada county can take up his abode in the soldiers' home, in soldiers' home precinct, in Ada county, intending to make that his home permanently, and with the intention of abandoning his former residence, and by continuous presence in said soldiers' home for thirty days (he having been in the state six months prior thereto), acquire the right to vote in said precinct. The stipulation of facts in this case shows that the votes in question were cast by inmates of the soldiers'

home, who, 'during all the time of their residence in Ada county, .... were maintained in the said soldiers' home at the public expense.' With all due deference to the inmates of said soldiers' home, there can be no question but what it is an 'asylum,' maintained 'at the public expense.'

\* \* \* \*

"In *People v. Hagan* the question arose whether an inmate of a hospital, who performed certain labor there, was 'kept at the public expense.' The court, *inter alia,* said: 'The question, then, is, Was the relator "kept" (that is, supported—*Silvey v. Lindsay,* 107 N.Y. 60, 13 N.E. 446) in the hospital? If so, he neither gained nor lost a residence by reason of his presence there while being so kept or supported . . . But, if he was simply an inmate of the hospital under a bare license—that is, with mere permission to use it as an asylum—then, clearly, he could not gain a residence there while enjoying the maintenance it afforded him . . . It was, in part, at least, to prevent such institutions from being utilized for political purposes, that this provision of the constitution was adopted.' "

The court then held:

"A constitutional provision which provides that 'for the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence . . . while kept at any almshouse or other asylum at public expense,' 'preserves the voting status of the inmates of a soldiers' home at the time of their entry thereto, and such inmates cannot acquire, by reason of their presence in such soldiers' home, and while kept at public expense, the right to vote in the county and precinct in which such institution is located."

It will be noted the decision in *Powell v. Spackman,* supra, was rested primarily on two propositions: 1. That the soldiers' home was an almshouse; next, that sec. 5, supra, was adopted to keep such institutions—almshouses and soldiers' homes—from being used for political purposes. Therefore, it is at once clear the question presented in the case at bar was not presented in *Powell v. Spackman.* Furthermore, if *Powell v. Spackman,* supra, is subject to the construction placed upon it by defendant, who, however, does not contend the decision was right, then the decision of this court in that case was wrong and ought to be, and

hereby is, overruled. The decision was wrong in that it placed veterans living at the Soldiers' Home on a level with paupers living in an almshouse. Such veterans were not, and the veterans now living at the Soldiers' Home, are not, paupers, and we refuse to brand them as such. Not only did *Powell v. Spackman* do that, but it also disfranchised the brave veterans then living there who had offered their lives for their country, and if adhered to in this case would disfranchise the valiant veterans now living in the Soldiers' Home, who likewise offered their lives for their country.

It is further contended *Reubelmann v. Reubelmann*, 38 Ida. 159, 220 P. 404, supports the proposition that a person cannot establish a new residence in this state for the purpose of prosecuting a suit for divorce while serving in the United States Army. It appears Mary E. Reubelmann commenced a suit for divorce in Pocatello in Bannock County, against her husband, Louis Reubelmann; that she had lived with her husband in Pocatello from 1887 to November 1919; that in November, 1919, she went to California where she remained until February, 1921; that her husband, Louis Reubelmann, contended she had lost her residence in the State of Idaho by going to California and remaining without the state for the period above stated. The court, in passing upon that contention, said this:

"The only question about this point (going to and remaining in California) is whether respondent (Mary E. Reubelmann), by going to California in November, 1919, and remaining there almost all the time up to February, 1920, lost her legal residence in Idaho. We think she did not. It is shown that appellant went to California immediately after respondent went and that for about two months after their arrival there they lived together as husband and wife. He returned to Idaho in January, 1920, while she remained in California until October, 1920, when she returned to Idaho for about ten days. She then went back to California and remained until February, 1921, when she returned to Pocatello and began this action for divorce. No special reason is assigned for her stay in California, but the record shows her to have been in a nervous condition, which might have necessitated the move. There is nothing whatever in the record to suggest her lack of residence in Idaho at the time this action began except the fact that, after more than thirty years of continuous residence in this state, she was actually without the state for the period stated."

Upon that state of facts this court held (we quote from paragraph three of the headnotes, which accurately states the holding of the court) :

"The temporary absence from this state of one domiciled here will not be held a change of residence, unless to the factum of residence elsewhere be added the *animus manendi*, for a domicile, having once been acquired, continues until a new one is actually acquired *animo et facto.*"

It is apparent the court was not called upon in *Reubelman v. Reubelmann*, supra, to interpret sec. 5, supra, nor to determine whether a person could establish a new residence in the State of Idaho for the purpose of prosecuting a suit for divorce while serving in the United States Army. Hence, *Reubelmann v. Reubelmann* is not in point here.

We conclude appellant could establish a new residence in Ada County, Idaho, and, therefore, that the District Court in and for that county has jurisdiction of the divorce suit of *Hawkins v. Hawkins*. Peremptory writ must issue and it is so ordered.

Dunlap, J., concurs.

GIVENS, J., concurring.—I concur with Holden, C.J., except as to *Powell v. Spackman,* 7 Ida. 692, 65 P. 503. That case not being in point, it is unnecessary to discuss it.

AILSHIE, J. (Dissenting).—The only question involved in this case is: Did the plaintiff, Charles T. Hawkins, submit sufficient proof to the District Court to show that he had established a residence in the State of Idaho, within the intent and meaning of the statute, sec. 31-701, I.C.A.?

The action was commenced by plaintiff in the District Court for Ada County against his wife, Laura Hawkins, for a divorce. The court found that:

"According to the pleadings and the proof the parties were married at Columbia, South Carolina, May 22, 1941, while plaintiff was a private in the United States Army and stationed at Langley Field, Virginia. Immediately thereafter plaintiff was transferred to Westover Field, Massachusetts, and then in January, 1942, was transferred and assigned to the air base at Gowen Field, Idaho. The complaint herein was filed in this court on August 24, 1942,

after which plaintiff was again transferred and assigned to Almagordo Field, New Mexico, where he is now stationed. At the hearing plaintiff appeared in court under a furlough or grant of leave for the purpose of his case.

". . . under the undisputed evidence, plaintiff changed his place of residence from Langley Field, Virginia, to Westover Field, Massachusetts, and then to Gowen Field, Idaho, not voluntarily but under military orders. His personal desires and wishes were not consulted. He was sent here for a temporary and special purpose, for further training in the air service of the United States Army.

"If the term 'residence' under our divorce statutes means domicile and a change of domicile can only be made by compliance with the rule announced in the Reubelmann case, [38 Ida. 159] supra, this plaintiff has not established a legal residence in Idaho for divorce purposes, and this court has no jurisdiction of this suit."

The court accordingly dismissed plaintiff's action.

It further appears "that shortly after reporting to said Gowen Field, he [plaintiff] was granted permission by his commanding officer at said base to live down town in Boise for several months, during which time he rented a room in Boise, made his home there and lived there and off the Gowen Field base, reporting for duty at Gowen Field as required."

Plaintiff and Laura Hawkins were married at Columbia, South Carolina, May 22, 1941, while plaintiff was a private in the United States Army stationed at Langley Field, Virginia. It does not appear where, when or how, if at all, he established a marital or matrimonial residence; nor does it appear where he claimed his legal residence at the time of his marriage. It is clear, however, that he was not then a resident of Idaho and did not come into the state until January, 1942. Plaintiff has made no effort to show his place of legal residence prior to coming to Idaho, but simply says that after arriving here and obtaining permission to live down town, "he decided to make Boise his then present, and future home."

It is well established, that one who has a fixed residence may and does retain that residence until such time as he makes up his mind to, and does, establish a bona fide residence elsewhere. (*Reubelmann v. Reubelmann*, 38 Ida.

159 at 163-4, 220 P. 404; *Kankelborg v. Kankelborg,* (Wash.) 90 P. (2d) 1018.) Everyone has a legal residence somewhere (Keezer, Marriage and Divorce, (2d ed.), sec. 445, p. 324; and it remains at the one place until changed to another.

It is clear that plaintiff did not voluntarily come to Idaho, nor did he come with any preconceived intent of establishing a home here. On the contrary, it requires no strain on the faculty of assumption to believe, that, having arrived in Idaho under military orders and having found after arriving that he was in a state where *only six weeks* residence is required for divorce purposes, he concluded that this would be an opportune time and favorable place to obtain a divorce from the girl he married, possibly hastily, down in South Carolina, where they do not grant divorce for any cause. (Art. 17, sec. 3, S.C. Const.) Were it not for the fact, that during all this time his residence or whereabouts was subject to military orders and, in that respect, he had no freedom of choosing either a temporary or permanent residence, the circumstances otherwise appearing might justify the inference of change of residence.

It would perhaps be too severe to say that, under no circumstances, can intentional bona fide change of residence be made by a soldier or sailor while subject to instant change to another post in a different state; but it seems clear that the circumstances of the particular service and situs thereof must have controlling consideration. (*Gallagher v. Gallagher,* (Tex. Civ. App.) 214 S.W. 516.)

Courts and text writers have given this subject some consideration, where the issue as to *residence* for various purposes arose. The circumstances of this case seem to justify a few excerpts from some of the authorities.

2 Bishop on Marriage, Divorce and Separation, sec. 88, says:

"Domicile is the place in which, both in fact and intent, the home of a person is established, without any purpose to return to a former home; the place where he lives, in distinction from that where he transacts his business; the place where he chooses to abide, in distinction from that in which he may be for a temporary purpose; the place which he has chosen, in distinction from one to which he may be exiled or sent a prisoner or, being in the government service, to which he is ordered; if he is entitled in law

to elect where to reside, it is the place which he has himself selected, in distinction from any which another may have selected for him; if an infant or a married woman, it is the place which the husband or father has ordained, in distinction from that of the person's own choice; it is ordinarily, in the case of the wife, the place where the husband has his domicil; every individual has a domicil; no person has more domicils than one; it is the place which the fact and the intent, combining with each other and with the law, gravitate to and centre in, as the home."

In ex parte White, 228 F. 88, 90, a taxation case, Judge Aldrich of the U.S. Federal Court says:

"The general proposition that the presence of the army in a particular locality is not of its own volition, and is presumably only temporary, is probably subject to the qualification that actual residence of members of the army in a given locality may be of such a fixed and permanent character as to exclude altogether the idea of domicile or residence in any other locality, and to the further qualification that, though one in the military service is subject to the orders of superior officers, the circumstances may be such that he remains so far sui juris, as to matters not involved in his military duties, that he may, if he so desires, change his domicile and establish it at any place he sees fit. Thus it is apparent that there is no hard and fast rule governing all cases.

"Assuming the proposition that a member of the army may change his domicile, if not inconsistent with the military situation, to be one based upon reason, and established by the authorities, it still remains that the intention to change must be clear, and must be associated with something fixed and established as indicating such a purpose, and *the circumstances in this case are against such an idea.*" (Italics inserted.)

In the comparatively recent case of *Sweeney v. District of Columbia* (a tax case), 113 F. (2d) 25, 129 A.L.R. 1370, Mr. Justice Rutledge, now of the Supreme Court of the United States, discussed the question of residence, domicile, and *change of residence* in a tax case, and among other things said:

"The considerations which we have held controlling require that evidence of intention to change be clear and unequivocal, whether its effect be waiver of privilege or to

overcome a presumption. The evidence here was not unequivocal."

The annotations to the Sweeney case are illuminating and cover the cases on the subject quite fully. As stated by Justice Rutledge, the rule which relieves a party from domiciliary taxation in one jurisdiction, necessarily subjects him to it in the jurisdiction of his legal residence. The same principle would apply in a divorce action.

In the case of *Harris v. Harris,* 215 N.W. 661, the Supreme Court of Iowa had under consideration the question of residence in a divorce case, wherein the plaintiff was an officer in the United States Army. The court gave the subject very exhaustive consideration and stated, inter alia, as follows:

"An officer may ask for a post and may, on his application, be assigned to it, but this is entirely in the will of his superior officer and the choice is not in the power of the applicant. Nor does an officer, under martial discipline, when detailed for special duty in a certain place, acquire a domicile there, although he may take his family there (*Knowlton v. Knowlton,* supra; *Remey v. Board of Equalization,* 80 Iowa, 470, 45 N.W. 899), and a person who enters the army of another country gets no domicile in the country whose army he joins (Ex parts Cunningham, 13 L.R.Q.B.D. 418). Therefore a person under such circumstances cannot, in any proper sense of the term, have a residence any where other than the home he has left, since he has no choice as to where he goes, the time he can remain, or when he shall return. To gain either an actual or legal residence there is, of necessity, involved at least the exercise of volition in its selection, and this cannot be affirmed of the residence of either a soldier or sailor in active service."

In deciding the issue before us, the wives, mothers, and girls back home must not be wholly forgotten. They are doing their part in the war effort as diligently and courageously as are the boys who have been called to arms. It is too much of a strain on human credulity, to believe that a soldier under military order, moving from one military reservation to another, may mentally change his matrimonial domicile in a six weeks stay at or in calling distance of his military headquarters—moving so fast that he is subject to orders from at least four different military posts in as many different states in 15 months. Under such circum-

stances, how is the girl he married, on the other side of the continent, now perhaps carrying his unborn offspring, going to keep informed as to his mental reservation and change of residence at one (or which one?) of these several military bases? It requires two people to contract matrimony and the girls who marry soldier boys do not kidnap or coerce these boys; they go about it usually in good faith and connubial devotion; and, after the ceremony and her sol-. dier boy is gone and has no home to invite her to, she has but slight chance of changing her mind or domicile, to either be with him or in a home provided by him for her; nor can she chase across a continent to establish a domicile for herself.

The facts and circumstances of the case controvert and disprove the individual personal declaration of intention to establish a bona fide residence here in Idaho, as distinguished from an enforced military encampment for training in the government's armed war service. How can an *intention* to become a resident of a given municipality or state be more than a wish or hope, when it may be brushed aside any moment by a military order to move on to another state or a foreign country? How is the girl who plighted her vows to be the soldier's wife going to know about these sudden changes of matrimonial domiciliary intentions? Is she going to become a mind reader to fathom the intention of her husband after he has, by force of military orders, moved on to discharge his patriotic duties elsewhere?

The necessity of *proofs* as against *presumption* in such cases as this is well and sensibly stated by the Texas court in *Gallagher v. Gallagher*, 214 S.W. 516 at 518, as follows:

"Ordinarily, it is a presumption of law that where a person actually lives is his domicile, such presumption of course being rebuttable; but no such presumption could arise in the case of a soldier in active service, who has no choice of domicile, but must ordinarily cling to his domicile of origin. Ordinarily, an act of removal to a certain location, coupled with the intent to make a permanent residence there, might be sufficient to fix a domicile, but that is because the removal is voluntarily made, which could not occur in the case of a soldier in active service. It follows that the removal of the latter to a place and his residence there for years would not offer any probative evidence to corroborate evidence as to an intention to make the place

his home, but it would be necessary to obtain other corroborative facts of that intention."

The framers of the constitution took precaution to protect both parties (husband and wife) in the exercise of their franchise rights, by providing: (Art. 6, sec. 5, Const.)

"For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of this state, or of the United States, nor while engaged in the navigation of the waters of this state or of the United States, . . ."

It is unbelievable that the framers of the constitution would be more solicitous about safeguarding the citizens' right of suffrage than they were to protect the family domicile, the social unit on which the state must rest for its sovereignty and well-being. Moreover, this provision of the constitution was a grant and not a limitation of rights and privileges. The congress has carried the principle of this constitutional provision into a federal legislative act providing that "For the purposes of taxation in respect of any *person, or of his property,* . . . such person [soldiers, sailors, etc.] shall not be deemed to have lost a residence or domicile in any state . . . or to have acquired a residence or domicile in, or to have become a resident in or a resident of, any other state, . . ." (Italics supplied.) (Sec. 514, "Soldiers and Sailors Civil Relief Act, Amendments of 1942"; Act of Oct. 6, 1942, U.S. Code Cong. Service, 1942, No. 9, p. 1214.) If he can not lose or acquire a residence for voting purposes, and his property can not be taxed in any place except where he lived when he entered the armed services of the United States, how is he going to lose or acquire his domicile during the same time for the purpose of severing his matrimonial contract?

I am unable to see how in what manner the case of *Powell v. Spackman,* 7 Ida. 692, 65 P. 503, has any bearing on our present problem. This case in no way involves the status of a resident of the Soldier's Home; and I fail to discover any good reason for either overruling or approving that case, or criticising our predecessors who decided the case.

I conclude that, under the facts as they appear on the record before us, plaintiff failed to establish the necessary jurisdictional fact of residence.

The writ should be quashed.

BUDGE, J., dissenting.—I concur with Mr. Justice Ailshie. However, I wish to be understood as not being in accord with the majority opinion in *Powell v. Spackman,* 7 Ida. 692, 65 P. 503. The minority opinion written by the late Chief Justice Sullivan expresses my views in that case.