# THURMON B. GREENE v. ROSE C. GREENE.—309 S. W. (2d) 403.

Western Section. June 21, 1957.

Petition of Certiorari denied by Supreme Court October 4, 1957.

Rehearing on Certiorari denied by Supreme Court February 6, 1958.

412

Thomas C. Rhem and Clyde P. West, Memphis, for appellant.

James R. Younger and Alexander W. Dann, Jr. (of Tual, Younger & Dann), Memphis, for Hon. Poston Cox, Divorce Proctor of Shelby County, Tennessee.

BEJACH, J. This cause involves an appeal by Thurmon B. Greene from a decree of the Chancery Court of Shelby County dismissing his suit for divorce against the defendant, Rose C. Greene. For convenience, the parties will be styled as in the lower court, complainant and defendant, or called by their respective names.

Complainant filed his bill or petition for divorce, May 14, 1956. In his petition, complainant alleges that he is a resident of Shelby County, Tennessee and has been such for more than two whole years before the filing of his

suit, and that the defendant is a nonresident of Tennessee, being a resident of the State of Wisconsin. As grounds for divorce, the petitioner alleges willful or malicious desertion by the defendant or absence from the complainant without reasonable cause for two years or more; that the defendant has refused to remove with petitioner to this State without a reasonable cause, and has willfully absented herself from him for two years or more; and that the defendant has been guilty of such cruel and inhuman treatment or conduct towards petitioner as renders cohabitation unsafe and improper. Service of process was had on the defendant by publication, on the ground of nonresidence, and a judgment pro confesso was taken against her. Hon. Poston Cox, Divorce Proctor of Shelby County, filed an answer in the cause May 22, 1956, and appeared at the trial of the cause by and through William B. Ingram, Deputy Divorce Proctor, who cross-examined the complainant and his witnesses. Also, at the hearing, the Chancellor appointed as amicus curiae, James R. Younger, Esq., a member of the Memphis Bar, who at that time announced to the Court that he was a member of the Legal Aid Committee of the Bar Association of Tennessee, and that in that capacity he had received from the Legal Aid Society of Milwaukee, Wisconsin, the residence of defendant, various papers including letters, documents and statements from said Legal Aid Society, respecting the contention of defendant. In his capacity of amicus curiae, Mr. Younger thereupon cross-examined the complainant and other witnesses offered in his behalf, but made no effort to obtain a continuance of the cause, or postponement of same, for the purpose of obtaining the testimony of the defendant or ascertaining whether she desired to

enter an appearance in the cause or to contest same. At the conclusion of the hearing on December 21, 1956, the Chancellor dismissed complainant's petition and assessed the costs of the cause against him, including a $50 fee allowed in favor of the amicus curiae.

From this decree, the complainant has prayed and perfected his appeal to this Court.

At the hearing of the cause, complainant moved for permission to amend his bill or petition in three places by substituting for the year 1950, as alleged in said petition, the year 1951, as the year of the correct dates reflected in said three places; but the Court denied this motion.

The complainant, as appellant in this Court, has filed seven assignments of error, which are as follows:

I.

The Court erred in refusing to allow petitioner to amend his original petition, for the purpose of alleging correct dates, by substituting the year '1951' for '1950', the motion to amend appearing on page 17 of the transcript.

II.

The Court erred in decreeing petitioner failed to show the Court had jurisdiction to grant the relief sought, i. e., in holding petitioner was not a resident of Shelby County, Tennessee.

III.

The Court erred in decreeing petitioner had failed to show that the defendant had been guilty of cruel and inhuman treatment.

## IV.

The Court erred in decreeing petitioner had failed to show that the defendant had deserted him.

## V.

The Court erred in decreeing petitioner failed to show any refusal of the wife (the defendant) to remove to the State of Tennessee.

## VI.

The evidence preponderates against the decree of the Court.

It will not be necessary, in our opinion, to take up these assignments of error separately. Aside from the technical objections that the Chancellor erred in refusing to allow the amendment requested by complainant, and that the Chancellor erred in taxing a $50 fee in favor of the amicus curiae as part of the costs of this cause, these assignments of error present two basic issues to be determined by this Court, viz., whether or not the Chancery Court of Shelby County, Tennessee had jurisdiction to try the cause, and whether or not the complainant's proof established one or more of the grounds of divorce alleged by him.

Unfortunately, the cause is before us on a narrative bill of exceptions, which is nearly always unsatisfactory. In this case, however, the narrative bill of exceptions is unusually full in its presentation of the testimony of the complainant and his witnesses. In addition, the Chancellor incorporated into the bill of exceptions a written finding of facts.

This cause is before us under the provisions of Section 27-303, Tenn. Code Ann. for a trial de novo, with a presumption that the Chancellor's decree is correct unless the evidence preponderates against same.

The complainant testified that he and the defendant, Rose C. Greene, were married in Waukegon, Illinois, October 2, 1948, that one child has been born of their union, Rose Marie Greene, aged 7 years, who is in the custody of the defendant; that following the marriage, they moved to Racine, Wisconsin, where they lived until the fall of 1949; that during this period of time, petitioner was hospitalized about one month with a sickness growing out of wounds received in World War II, this hospitalization having been in Racine, Wisconsin; that in the fall of 1949, they moved to Milwaukee, Wisconsin so as to be near defendant's parents who lived there, and that petitioner obtained employment in that city. He testified further that about December 1, 1949, he and defendant got into a heated argument, during which she cursed him, using vile language, following which he slapped her; whereupon she called the police who arrested petitioner, but that he was dismissed in court the next day. He testified that he and defendant lived together thereafter until about December 15, 1949, at which time he returned home from work and found that the defendant had taken their child and moved to the home of her parents in Milwaukee, where she has resided ever since, and that they have not lived together as man and wife since that time. He testified that about January 8, 1950, he was admitted as a patient in the Woods Veterans Administration Hospital in Milwaukee, where his condition was diagnosed as empyema (spelled in the record "impiami") with moderate advanced tuberculosis, and that he re-

mained in that hospital until May 22, 1950. He testified that about that time, at the suggestion of a half-sister who lived in Marks, Mississippi, and some cousins who lived in Memphis, Tennessee, he applied for and was granted a transfer to the Veterans Administration Hospital at 1025 E. H. Crump Boulevard, Memphis, Tennessee, so that he could be near his relatives and because he expected to make Memphis his home; and that on May 13, 1955 his case was diagnosed as arrested, and he was discharged from the hospital. He testified that following his admission to the hospital in Milwaukee, the defendant visited him there and told him that she was afraid to come near him or let their child see him for fear that both she and the child might contract the disease of tuberculosis; that at that time, the defendant further told him that he was to "go his way" and that she and their child would never live with him again in their lifetimes, although both he and the physicians in the Milwaukee hospital advised defendant that tubercular patients were allowed to have visitors practically daily, without danger of communication of the disease to persons visiting patients, when precautionary measures were taken, such as wearing of masks provided for such visitors. He said, however, that the defendant visited him three times during his stay in the Milwaukee hospital, from January to May 1950; that he saw his child once through a glass window, and that he gave money to the defendant on all three occasions.

Complainant testified further that he was classified by the Veterans Administration as 100% war service connected disabled from tuberculosis, and that he obtained leave of absence in September 1951 to go to Milwaukee and file his claim for total and permanent disability with

the Veterans Administration there and to see his wife and child. He said that on that occasion he saw the defendant briefly; that she signed some papers for an allotment of his compensation from the Veterans Administration, and that he then returned to the hospital in Memphis. He said that since that time, September 1951, he has written the defendant several letters enquiring about the welfare of their child, but has not seen the child since then, although he admits having been in Milwaukee in July of 1952; that he never received any letters from the defendant nor were any of his returned to him at Memphis. He said that letters to defendant, written by him, were addressed to the home of her parents in Milwaukee, and that he sent a Christmas package to his child at that address, every year since 1950, except 1955, and that none of these packages were returned.

He testified further that in December 1951, he put in a long distance telephone call from Memphis to defendant at her Milwaukee home, and that his cousin, Mrs. Leach, talked to defendant. He said that Mrs. Leach, in his presence and hearing, told the defendant for him that he had asked her to talk to the defendant, and asked her to bring the child and come to Memphis to live; and that Mrs. Leach told the defendant that she would pay her traveling expenses from Milwaukee to Memphis and furnish her and the child an apartment in Memphis, but that the defendant never came to Memphis.

Complainant testified further that at the present time he is attending Bradley University in Peoria, Illinois, taking a course in watch repairing, under the Veterans Administration Rehabilitation program, but that he intends to return to Memphis, Tennessee when he has com-

pleted this course. He said that the defendant receives an allotment of about $86 per month from the Veterans Administration for the support of herself and the child, of which $32 per month is for the child, and that this allotment was not voluntarily made by him but was exacted by his wife. He said that he has two other minor children, whose ages are respectively 16 and 14 years, they being two of five children by a marriage prior to his marriage to defendant, and that each of these minor children receives $32 per month from the Veterans Administration.

He testified that he was reared near McCrory, Arkansas, has a number of relatives in Memphis and vicinity, including his cousin, Mrs. Virgie Leach, who lives in Memphis and with whom he grew up; that in May 1950, he requested a transfer to Memphis because he came from this section of the country; that many of his relatives lived here and that he intended to make Memphis his home. He said that during the time he was in the Memphis hospital, his cousin, Mrs. Leach, visited him regularly several times a week; that after he had been in the hospital for about six months, the doctors permitted him to spend a day or two occasionally in the home of Mrs. Leach in Memphis, and that by the end of his first year in the Memphis hospital, he was spending every weekend in the home of Mrs. Leach, with the doctors' permission, and that Mrs. Leach furnished him a private room in her home where he kept his clothing and personal effects. He said that he has no other property anywhere.

Complainant testified that when he was transferred to the Memphis hospital, the doctors advised that the course of treatment for arrest of tuberculosis would take at

least one to two years' confinement in the Memphis hospital; that after he had been in the Memphis hospital for a year and a half, he became discouraged over the progress of his case and left the hospital without permission and secured a job with the Banner Laundry in Memphis, but that when his health broke down, he reentered the hospital. During this time, he said he lived in the home of Mrs. Leach, and that about that time, he had his compensation records transferred from the Wisconsin Veterans Administration office to the Tennessee Veterans Administration office, listing his residence at that time as Memphis, Tennessee. He said that in 1954, after he had been in the Memphis hospital since 1950, he again became discouraged because he had not been discharged from the hospital, left the hospital without permission, and obtained a job with the Spur Distributing Company of Memphis, Tennessee, where he worked as an attendant in one of its filling stations for about two months when his health broke down again, and he reentered the hospital. During this period of time, he said he lived in the home of Mrs. Leach, and that in May 1955, when he was discharged from the Memphis hospital, he went back to Mrs. Leech's home to live where he remained until about September 1956, at which time he applied for rehabilitation training under the Veterans Administration program, and enrolled as a G. I. student at Bradley University, Peoria, Illinois,—which school he is presently attending and that he is temporarily residing in Peoria, Illinois. He said that he shows his home address at the school as Memphis, Tennessee, and intends to return to Memphis when he has completed his school course.

He testified that in the summer of 1955, after he had been discharged from the hospital and while he was

living in the home of Mrs. Leach, a Wisconsin warrant of some type was served upon him, charging him with having deserted the defendant, but that a hearing was had on the warrant in one of the Memphis courts and he was dismissed.

He testified that when he entered school in Peoria, Illinois, he received an additional allowance from the Federal government, making his total compensation about $154 per month, and that the allotment to the defendant for herself and their child was also increased to about $86 per month, which she is presently receiving.

On cross-examination by Mr. Younger, the amicus curiae, he testified that prior to his confinement in the hospital at Milwaukee he worked as a metal worker. He further testified on cross-examination that July 31, 1954, at Hernando, Mississippi, without any dissolution of the marriage between himself and defendant, he married Helen Matthews Baty. The marriage license and certificate of marriage for this his third marriage is included in the record. He also identified a letter dated June 28, 1956 written by him to his solicitor, Thomas C. Rhem, which enclosed a letter dated August 22, 1951, from an official of the Disabled American Veterans at Milwaukee regarding his claim for compensation, which letter advised him that his marriage with defendant was null and void because he had married defendant within less than one year after his divorce from his first wife. These letters are incorporated in the record. In the letter from the Disabled American Veterans, it appears that he was advised that if his wife made affidavit that she married him in good faith, without knowledge that the divorce had been granted less than a year before their marriage,

and had cohabited with him continuously, the marriage to defendant could be recognized as legal. He said that he marked this passage in the Disabled American Veterans' letter for the purpose of calling it to the attention of his lawyer. In the letter to his lawyer, he said that defendant was aware of his first marriage and knew the time of his divorce and that she had sworn falsely to the contrary so as to collect compensation. He denied that he had in fact deserted defendant and denied that he had effected a reconciliation with his wife and had marital relations with her, although he admitted that in July 1952 he made a trip to Milwaukee to attend the marriage of a daughter by his first marriage, and admitted having sent a telegram to defendant in December 1952 requesting a rendezvous at a Milwaukee hotel.

On cross-examination by Mr. Ingram, Deputy Divorce Proctor, he testified that during the entire time that he was in the Memphis Veterans Administration Hospital, No. 88, he was under the jurisdiction of the hospital authorities, and was allowed to leave the hospital only upon a pass issued by the authorities but that he had obtained such passes on his week-end visits to Mrs. Leach, and that when he had sought and obtained employment, he had been absent without official leave.

In replying to a question of the Chancellor, complainant admitted that although he alleged in his bill that he suffered during the war severe shrapnel wounds, he bears no external evidence on his body of any such wounds. On re-direct examination, by Mr. Rhem, complainant exhibited a copy of a decree of annulment in the Circuit Court of Peoria, Illinois, in the suit of Helen Matthews Greene v. Thurmon B. Greene, entered November 5, 1956, by

which the complainant's marriage to said Helen Matthews Baty was terminated. This decree recites that plaintiff, as defendant in that cause, had entered his appearance, and that all jurisdictional requirements had been met. This suit was filed in Peoria, Illinois, while the suit in the case at bar was pending. Complainant had previously testified, in the instant case, that after receipt of the letter from the Disabled American Veterans he had not consulted a lawyer about same but that considering his marriage with defendant void, he had entered into the marriage with Helen Matthews Baty.

Mrs. Virgie Leach testified that she resides at 1071 New York Street, Memphis, Tennessee; that she has been employed by the Crescent Laundry Cleaners, Memphis, Tennessee for the past thirteen years; that she is a cousin of petitioner, Thurmon B. Greene; that his parents died when he was about 3 years old; that he came to live with her family near McCrory, Arkansas, and did live with them until he was about 16 or 17 years of age; that he has a number of other relatives in Memphis and in Arkansas and in Mississippi; that petitioner calls her "sister"; that she and petitioner have always been close and have kept in touch with each other throughout the years. She said that in 1950 the petitioner was transferred to the Veterans Administration Hospital on Crump Blvd. in Memphis; that when he arrived she visited him nearly every day; that after petitioner had been a patient in the hospital about 6 months, the doctors there allowed him to spend a day occasionally in her home in Memphis; that he commenced spending every week-end in her home after he had been a patient for about a year; that she maintained and provided a room in her home for him where he kept his clothing and personal effects from

about 1950 until the fall of 1956, when he entered the watchmakers school in Peoria, Illinois. She said that about 1952, petitioner obtained a job with the Banner Laundry in Memphis and worked for about a month, but had to return to the hospital when his health failed; that again, about a year later, he left the hospital and secured another job with Spur Distributing Company in a Memphis filling station, where he worked about a month or two until his health failed again and he was forced to return to the hospital; and that, during all of these times, he lived in her home in Memphis.

She testified further that about September 1951, petitioner left the hospital in Memphis and went to Milwaukee; that about December 1951, while petitioner was visiting in her home in Memphis, he requested her to talk to defendant and ask her to come to Memphis; that petitioner, in her presence, placed a long distance telephone call to Milwaukee for defendant; that when defendant answered the telephone, petitioner turned the telephone over to her (Mrs. Leach), and that she talked to defendant. She said that she asked defendant to come to Memphis with her child and live so that she could be with her husband, the petitioner; that she told the defendant that she would pay her traveling expenses from Milwaukee to Memphis and would furnish her an apartment to live in, without expense to her or the petitioner, in Memphis; and that defendant told her that she would not come to Memphis.

She testified further that in the summer of 1955, after petitioner had been discharged from the hospital and was living in her home, an out of state warrant was served on him charging him with desertion and bigamy,

or something of that nature, and that petitioner was taken into custody by the Memphis police but released the same day by a court in Memphis.

She testified that after petitioner was discharged from the hospital in May 1955, he lived in her home continuously until about September 1956 when he enrolled in the watchmaking school at Bradley University, Peoria, Illinois, under the G. I. Bill; that he was not able to do much work after his discharge from the hospital because of his delicate health, but that he painted and redecorated her home and rested most of the time. She testified that petitioner told her that he was coming back to Memphis to live as soon as he finished his watchmaking course in Peoria, Illinois.

On cross-examination by Mr. Younger, Mrs. Leach testified that she knew petitioner married a woman named Helen Matthews Baty in July 1954 while he was still married to defendant; that the woman lived next door or in the neighborhood of her home. She said that she knew of her own knowledge that petitioner resided in Memphis during the entire period of time he was stationed at the Veterans Administration Hospital and until he left Memphis for school in Peoria, Illinois.

On cross-examination by Mr. Ingram, Deputy Divorce Proctor, she testified that she only talked to defendant, Rose Greene, about coming to Memphis to live with petitioner on one occasion; and that was when petitioner was on pass from the hospital and at her house.

Patricia Greene testified that she is 16 years of age, a daughter of petitioner by a former marriage, and lives in Milwaukee, Wisconsin with her mother; that she has

four sisters, the children of petitioner, ranging from 26 to 14 years of age; and that she and the 14 year old sister receive a child support allotment of $32 per month, each, from her father's Veterans Administration compensation.

She said that the defendant lives in Milwaukee and has never come to Memphis to visit her father, as far as she knows. She said that since 1950 she has visited her father, the petitioner, in Memphis, three times,— twice with one of her other sisters.

On cross-examination by Mr. Ingram, she testified that in the fall of 1954 and again in the fall of 1955, she came to Memphis to see about living with her father as he had on each occasion written her that he had a place for her to stay; that on these occasions she came down to see about it; that on each of these occasions she stayed for about a month, then returned to Milwaukee; and that the reason she did not remain to live in Memphis with her father, the petitioner, was that he was unable to provide for her, and that he did not have a place for her to stay. She said that the times she was in Memphis visiting her father, she had stayed with Mrs. Leach.

In his finding of facts, the Chancellor said:

"The Court dismissed the bill, primarily, on the four grounds set forth in the final decree, as follows:

"(1) The petitioner failed to show that this Court had jurisdiction to grant relief sought;

"(2) The petitioner failed to show that the defendant had been guilty of cruel and inhuman treatment;

"(3) The petitioner failed to show that defendant had deserted him; and

"(4) The petitioner failed to show any refusal of the wife (the defendant), on any offer properly made, to move to the State of Tennessee.

"It may be said at the onset of this discussion that few, if any, witnesses have appeared before this Court as impeached and discredited as has the complainant."

The Chancellor's finding of fact is critical of complainant for allowing each of his minor children to subsist on $32 per month received from the government, while he spends at least $154 per month, a government allotment, on himself. The finding then continues:

"The complainant married the defendant, Rose C. Greene, on October 2, 1948, and one child was born to the parties within a year or so. However, on October 2, 1948, the complainant was married to another woman—presumably the mother of the five children mentioned, certainly a then impediment to a then proper marriage. In addition, to further confound and confuse without apparent rhyme or reason, and without bothering to dispose of Rose C. Greene in some legal manner, the complainant participates, as bridegroom, in a formal marriage ceremony, on July 31, 1954 with one Helen Matthews Baty.

"This present bill is filed for the purpose of formally disposing of Rose C. Greene, the proof evidencing that Helen Matthews Baty procured a decree of annulment in Illinois on November 5, 1956, this however, after the bill herein was filed on May 14, 1956."

With all due respect to the learned Chancellor, we think he was clearly in error when he held that he was without jurisdiction in this cause. The basis of his holding is that the complainant was not a legal resident of or domiciled in the State of Tennessee. Apparently, both the Chancellor and the Divorce Proctor were of opinion that complainant, as a patient in the Veterans Hospital, was in the same situation as a soldier or sailor in government service who was ordered to Shelby County, Tennessee, and resided there simply because he was under orders so to do. The Divorce Proctor's brief in this Court cites and relies on the cases of Sturdavant v. Sturdavant, 1944, 28 Tenn. App. 273, 189 S. W. (2d) 410; and Tyborowski v. Tyborowski, 1943, 28 Tenn. App. 583, 585, 192 S. W. (2d) 231, 233.

In the case of Tyborowski v. Tyborowski, the opinion of the Court of Appeals (Middle Section) written by Hickerson, J., quotes with approval from the Texas case of Wilson v. Wilson, Tex. Civ. App., 189 S. W. (2d) 212, 213, as follows:

"In order to be an inhabitant one must acquire a domicile or home, and it must have the stamp of permanency on it. There must not only be an intention to establish a permanent domicile or home, but the intention must be accompanied by some act done in the execution of the intent. A soldier can abandon his domicile of origin and select another, yet, in order to show a new domicile during the term of enlistment, there must be the clearest and the most unequivocal proof."

Also, from the opinion of the Court of Appeals (Middle Section) written by Howell, J. in the case of Sturdavant

v. Sturdavant, we quote [28 Tenn. App. 273, 189 S. W. (2d) 412]:

"It is true that the defendant would not have been precluded from establishing a domicile in the State of Tennessee by reason of the fact that he was in the United States Army and at Camp Forrest under orders of the Military Authorities, if he had so desired. See Percy v. Percy, 188 Cal. 765, 207 P. 369; Hawkins v. Winstead, 65 Idaho 12, 138 P. (2d) 972, and many other cases.

"We find, however, that in this case there is nothing to indicate a change of domicile except the self serving declarations of the defendant that he had such intentions. These are not sufficient."

Subsequent to the Sturdavant case and the Tyborowski case, this Court has heard and disposed of the case of Bernardi v. Bernardi, in which the same questions of the right of a sailor in the United States service at Millington, Tennessee to acquire a domicile in Shelby County, Tennessee, was considered. In that case, we held that the unequivocal statements of this service man of his intention to make Shelby County his permanent home, coupled with inquiries and efforts to obtain employment in Shelby County at the expiration of his term of enlistment, plus the fact that he had married in Shelby County, Tennessee and established his marital domicile there, was sufficient to constitute the clear and unequivocal proof necessary for that purpose. Bernardi v. Bernardi, 42 Tenn. App. 282, 302 S. W. (2d) 63, opinion filed December 20, 1956, certiorari denied by the Supreme Court, April 1, 1957.

█ The instant case is, in our opinion, a much stronger case for complainant, with reference to his establishment of domicile in Memphis, Shelby County, Tennessee. In the first place, he was transferred to the Memphis hospital from Milwaukee, at his own request, and with the reason then assigned that he expected to make Memphis his permanent home so as to be near his relatives who reside in this vicinity. Subsequently, he had his compensation records transferred from Milwaukee to Memphis. Furthermore, according to his testimony, after he was discharged from the Veterans Hospital, he definitely confirmed this previously expressed intention and established Memphis as his home, which choice he further confirmed by designating Memphis, Tennessee, as his residence when he enrolled for the watch repair course, under the G. I. Bill of Rights, at Peoria, Illinois. Also, he is corroborated by the testimony of his cousin, Mrs. Virgie Leach, and by the testimony of his daughter Patricia Greene. More than a year had elapsed after his discharge from the hospital during all of which time he was claiming Memphis, Tennessee as his place of residence.

██ On the other hand, we are confronted with the situation that the Chancellor considered complainant a discredited witness and, presumably, disbelieved his testimony. Wholly aside from the corroborating testimony, which is before us in the record, unimpeached, we think that the reasons assigned by the learned Chancellor for considering complainant a discredited witness, did not warrant that conclusion on his part. As was said in 1874 by Lord Chief Justice Cockburn, in the case of R. v. Castro (Tichborne), quoted with approval in Volume 3 of Wigmore on Evidence, 3rd Edition, Section 982, page 549:

·"Lord B. (a witness) has committed a woefully sad sin; * * * Another man's wife left her husband and joined him, and they have lived together; * * * (Counsel) asks you deliberately to come to the conclusion that because of this offense of Lord B. is not to be believed upon his oath,—nay, more, that you must assume him to be perjured. Is that, do you think, a view you can properly adopt? Is it because a man has committed a breach of morality, however flagrant, that those to whom his testimony is important in a court of justice are to be deprived of it? * * * There are crimes and offenses which savor so much of falsehood and fraud that they go legitimately to the credit of witnesses. There are offenses of a different character, and grevious offenses, if you will, but which do not touch that particular part of a man's moral organization—if I may use that phrase, —which involves truth; and there is an essential distinction between this species of fault and those which go to the very root of honesty, integrity and truth, and so do unfortunately disentitle witnesses to belief."

In the instant case, it may be admitted, or assumed, that complainant's marital escapades and neglect of his children, constitute reprehensible conduct on his part; but such conduct does not, in our opinion, establish a sufficient ground for discrediting his testimony, especially that part of his testimony which deals with his choice of Memphis, Tennessee as his place of residence and his intention to reside there in the future. Certainly, there is no justification for the Chancellor's finding: "He is now a resident of Peoria, Illinois, where he has resided since September 1956." Complainant's own testimony,

which is not contradicted by any other testimony or by any circumstances shown in the record, is that he was in Peoria solely for the purpose of learning the watch repairing trade, under the G. I. Bill of Rights, and that he intends to return to Memphis when he has completed the course there. In that situation, his temporary absence from Memphis, the domicile of his choice, is substantially analagous to the situation of the complainant in the case of Fickle v. Fickle, 13 Tenn. 203, 204, in which Green, J., speaking for the Supreme Court of Tennessee, said:

"When citizenship is once established, and in this case it certainly is, the Court will not consider, where there is no intention to abandonment, that mere absence from the State will be such abandonment. Here the proof expressly negatives such intention. The residence in Virginia was temporary, and under circumstances rendering it proper that every intendment should be made in favor of the protection which the rights of citizenship offered. The petitioner was helpless, abandoned by her husband; she sought the house of a relation as an asylum from want and penury. This was no abandonment of her home in Tennessee; her husband was here; her absence involuntary on her part; she had not the means of subsistence without the shelter she sought temporarily in Virginia.

"Had it been necessary for her to have visited a watering-place in Virginia for the recovery of health, the plea would have been not stronger."

■ With reference to complainant's testimony, tending to prove the grounds of divorce alleged in his petition, on the other hand, we cannot say that the Chan-

cellor's disbelief of complainant's testimony should be brushed aside with the same assurance, on our part, as with reference to complainant's testimony on domicile. While the complainant testified that his wife deserted him Dec. 15, 1949, and that shortly after his admission to the hospital in Milwaukee, January 8, 1950, the defendant told him she was afraid to come near him or let their child see him for fear of contracting the disease of tuberculosis, and that she told him at that time that he was to "go his way", and that she and their child would never live with him again; nevertheless, other testimony by him shows that she did visit him at least three times while he was in the hospital at Milwaukee, between January 8, 1950 and May 22, 1950. Furthermore, taking complainant's testimony in the light most favorable to him, it still remains uncorroborated except to a very slight extent by the testimony of his cousin, Mrs. Leach, and by that of his daughter, Patricia. In that aspect of the case, we think the situation is controlled by the decision of the Supreme Court in Fulford v. Fulford, 156 Tenn. 640, 4 S. W. (2d) 350, which holds that a divorce should not be granted in the absence of corroborating testimony, where it is reasonably practical to obtain such corroborating testimony.

■ On the ground that the defendant had refused to remove to this State, and had willfully absented herself from him for two years, we think the Chancellor's decision may be sustained on the ground that the complainant's proof did not comply with the requirements of Section 36-815, Tenn. Code Ann., which requires, in such cases, proof that the complainant did not remove to this State for the purpose of obtaining a divorce. See Baeyertz v. Baeyertz, 171 Tenn. 190, 101 S. W. (2d) 689.

■ With regard to the charge of cruel and inhuman treatment, we agreed with the Chancellor's conclusion that the evidence did not warrant the granting of a divorce on that ground.

It seems to us, however, that the Chancellor has based his decree of dismissal primarily on his finding that his Court was without jurisdiction, with which finding this Court has definitely disagreed. This is clearly indicated by the following language in the Chancellor's written finding of facts:

"With respect to the specifically set forth basis for dismissing the bill, the Court finds no evidence in the record that the complainant is, or ever was, domiciled in the State of Tennessee.

"He is now a resident of Peoria, Illinois, where he has resided since September 1956. It is true that he testified that Memphis is his home, but there appears no objective evidence of domicile, such as registration for voting, listing in a directory or phone book or anything that could prove domicile within the meaning of our divorce laws. The important issue of domicile must depend upon the word of the complainant to which the Court cannot extend verity. The Court concludes that complainant is not and never has been, domiciled in the State of Tennessee. On this issue, the Court considers that the complainant may have his remedy of divorce, if it is available to him in his last established domicile where his wife is and not prevented by excessive expense from protecting her interest and those of her child."

Inasmuch, as we have definitely disagreed with the ruling of the Chancellor on the question of domicile, and hold that his Court has jurisdiction to hear the cause; in view of the state of the record before us, we think the equities of this case will best be served by remanding the cause for further proof, as is authorized by Section 27-329, Tenn. Code Ann. See also, Killibrew v. Elliott, 1850, 30 Tenn. 442; Grider v. Harbison, 1869, 46 Tenn. 208; Whaley v. King, 1918, 141 Tenn. 1, 206 S. W. 31; Sartain v. Dixie Coal and Iron Co., 1924, 150 Tenn. 633, 266 S. W. 313; Wood v. Neely, 1874, 66 Tenn. 586; Bank of Jamaica v. Jefferson, 1893, 92 Tenn. 537, 22 S. W. 211, 36 Am. St. Rep. 100; Wilson v. Wilson, 151 Tenn. 486, 267 S. W. 364; King v. Buckeye Cotton Oil Co., 155 Tenn. 491, 296 S. W. 3, 53 A. L. R. 1086; Gem Motor Co. v. Securities Investment Co., 1933, 16 Tenn. App. 608, 65 S. W. (2d) 590, and Southeastern Express Co. v. Bowers, Inc., 1936, 21 Tenn. App. 295, 109 S. W. (2d) 851.

In particular, we think the Chancellor, by and through the Divorce Proctor, or possibly through the agency of the amicus curiae appointed by him, should obtain the testimony of the defendant in this cause, or at least ascertain from her information as to whether or not she desires to contest this cause. In addition, this remand will enable complainant to obtain additional testimony, if available; and in particular, testimony from Milwaukee, Wisconsin, corroborating his own testimony with reference to the grounds of divorce alleged by him.

There remain for disposition complainant's assignments of error complaining of the rulings of the Chancellor which refused complainant's application to amend

his petition by correcting three dates, alleged in the petition as being in 1950, to similar dates in 1951, and of the action of the Chancellor in taxing as part of the costs of this cause, which were adjudged against complainant, a $50 fee for the amicus curiae appointed by the Chancellor.

With reference to the refusal by the Chancellor of complainant's proposed amendment, we think the Chancellor might properly have allowed this amendment; but his refusal to do so did not prejudice complainant because he was allowed to and did prove the dates, as claimed in the proffered amendment, rather than as alleged in the petition. If the Chancellor had excluded this evidence, or had refused to consider same, because at variance with the allegations of complainant's petition, this Court, hearing this cause de novo, on the authority of Anderson v. Anderson, 3 Tenn. Civ. App. 423, could have treated the amendment as having been allowed.

With reference to the complainant's objection to the $50 fee allowed in favor of the amicus curiae and taxed as part of the costs which were adjudged against him, we think the complainant's objection is well taken. On the subject of allowance of compensation in favor of an amicus curiae, American Jurisprudence in the treatise on Amicus Curiae, Volume II, Sec. 8, page 682, says:

"Ordinarily, no compensation is sought for at the hands of the Court by an amicus curiae. Nevertheless, it has been held that the Court has inherent power to award compensation to an amicus curiae, to be paid by the party whose acts made his appearance necessary for the information of the Court."

The above quoted language would seem to justify the allowance of compensation by the Chancellor in favor of the amicus curiae; and, ordinarily, or in most of the counties of this State, this would conclude the matter. In Shelby County, however, where this cause was tried, there is an official known as the Divorce Proctor, provided by Chapter 121, Public Acts of 1915, who appeared in the instant case through a Deputy Divorce Proctor,—also authorized by said Chapter 121, Public Acts of 1915,—and who, through counsel employed by him, including the amicus curiae appointed by the Court, has appeared in this Court resisting the complainant's appeal. Said Chapter 121, Public Acts of 1915, in Section 3 of same, provides: ''Be it further enacted, That it shall be the duty of the divorce proctor to appear upon trial of every divorce case in his county, whether the suit is contested by the defendant or not.'' * * * and ''Immediately upon the commencement of a suit for divorce, it shall be the duty of the divorce proctor to investigate the charges made in the bill and he shall be prepared to advise the court, upon the hearing, as to the merits of the case.'' Section 4 of said Act provides: ''Be it further enacted, That the divorce proctor shall have power to cause witnesses, including the parties to the suit, to be subpoenaed to testify, respecting any charges made in the bill or the answer or upon any matter touching the marital status of the parties, the performance or neglect, of any duty by either, to the end that justice may be done the parties and that society may be protected and the sanctity of the marriage relation preserved; and the divorce proctor shall have the power and authority, upon the trial of the suit, to examine all witnesses.''

In view of these provisions of the Act creating the office of Divorce Proctor, who, through his deputy, was actually in attendance at the trial of this cause, we can think of no assistance which the amicus curiae appointed by the Chancellor could give, that the Chancellor, with equal facility, could not have demanded of the duly authorized official, created by law for that purpose. In that view of the situation, even though it may have been proper for the Chancellor to appoint an amicus curiae, we think it constituted a clear abuse of his discretion when he assessed against the complainant, as part of the costs in this cause, a fee of $50 in favor of said amicus curiae. We think, furthermore, that, so far as the record of this cause shows, the amicus curiae appointed by the Chancellor has done nothing to earn the fee allowed in his favor by the Chancellor. At the very least, after his appointment by the Chancellor, we think he should have applied for a continuance of the cause, or postponement of same to a later date, in order that he might get in contact with the defendant and ascertain whether or not she desired to enter an appearance in the cause, what was her version of the allegations of complainant's petition, and probably take her deposition for the information of and assistance to the Chancellor. If that had been done, we would say that the amicus curiae had earned his fee; but even this would not have obviated the objection that the same thing could have been done with equal facility by the Divorce Proctor.

Since this cause is being remanded for further proceedings, consistent with this opinion, this procedure can be followed before the cause is again presented for hearing. Complainant's assignment of error objecting to the assessment of this fee against him is sustained.

It follows that the ruling of the Chancellor that he was without jurisdiction to hear this cause must be reversed, and, for the reason stated above, the cause will be remanded to the Chancery Court of Shelby County for further proceedings consistent with this opinion. The $50 fee taxed as part of the costs of this cause in the lower court will be disallowed. The costs of the appeal, together with the costs of the lower court, minus the $50 fee allowed in favor of the amicus curiae, will be taxed against the complainant, Thurmon B. Greene, and his surety on the appeal bond.

Avery, P. J. (W. S.), and Carney, J., concur.